JOHN MARTIN LOTZ, complainant,

*v.*

ADDIE J. RIPPE, individually and as executrix, &c., of Annie
E. Rippe, deceased, et al., defendants.

[Submitted July 18th, 1924.   Decided July 26th, 1924.]

**Specific Performance—Contract for Transfer of Real Estate
upon Death of Transferee—Irrevocable Bequest in Will—
Subsequent Will Making Other Disposition—Justice and
Equity of Former Contract—Counter-claim of Defendant for
Services to Testator—Decree for Compainant.**

On bill, &c.

*Messrs. John S. Applegate & Son,* for the complainant.

*Messrs. Reilly, Quinn & Parsons,* for the defendants.

FOSTER, V. C.

This is an action to compel the specific performance of a
written contract for the sale of real estate in Monmouth
county, made by complainant with the decedent, Annie E.
Rippe, on June 19th, 1919. The defendants are the daughters
of Mrs. Rippe, and Addie J. Rippe is the executrix of her
will.

They resist complainants claim on the ground that he
obtained the contract through fraud and the exercise of
undue influence, and that there is no consideration for the
contract. The defendant Addie J. Rippe, individually, by
her counter-claim, seeks alternative relief and compensation
for work and services performed for, and rendered by her to
decedent, under an agreement alleged to have been made
between her and her mother in May, 1916. Complainant, by
his replication, disputes this contract, denies liability there-

under, and pleads the statute of limitations as a bar to its enforcement.

From a mass of contradictory evidence the following facts are clearly established: Complainant, who is an unmarried man, about forty-nine years of age, is the nephew of Mrs. Rippe: for years he worked for her and her husband on their farm for $10 a month and his board. After Mr. Rippe's death, in 1900, and after the farm had been sold and the premises in question, which consists of about two acres of land and an ordinary house of eleven rooms, in West Long Branch, had been purchased by Mrs. Rippe, in 1907, complainant continued to live with her until her death, in November, 1923. He worked as a carpenter, and paid her $5 weekly for his board, and did chores about the place without pay. When Mrs. Rippe bought the property, in 1907, she placed a mortgage for $3,000 on it, and this mortgage, now reduced to $2,500 by payments made by complainant, is still a lien upon the property.

This property was the only estate Mrs. Rippe had, and her sole source of income was from the sale of vegetables raised on the place, largely through complainant's work, and from a few permanent and summer boarders, who paid about $10 per week.

Defendants claim the mother's income in summer from these sources averaged about $200 weekly, having as many as twenty boarders at a time.

I am unable to believe this, as the house contains only seven bedrooms, and five of these were permanently occupied by members of the household, including complainant, who was the only one of the five to pay any board. The permanent use of these bedrooms left only two bedrooms and the living rooms for the accommodation of summer boarders.

Whatever Mrs. Rippe's income was, it was not sufficient to enable her to maintain her household and to regularly pay the fixed carrying charges of the property.

This condition was known to the members of the household and the matter was occasionally discussed. About May, 1919, Mrs. Rippe was not in good health and was worrying over

this situation, and complainant then proposed to her "that if she would make the place over to him for the amount of the mortgage he would keep a roof over her head." She asked for time to think the matter over, and about a month later she asked him to go with her to her lawyer's office.

Complainant states that the day before he made this offer to her he made the same suggestion to her daughter, the defendant Addie, who replied "that it was a wonder someone hadn't done or thought of that before." This is denied by Addie, who states she never heard of the matter until about three months before her mother died.

On June 19th, 1919, complainant accompanied Mrs. Rippe to the office of her attorney, John S. Applegate, Jr., in Red Bank (the Applegate estate is the owner of the mortgage upon the property), and thereafter a conference with Mr. Applegate, in which the reasons for and the details of the arrangement were discussed, the agreement in question was drawn and executed by complainant and Mrs. Rippe, and at the same time Mr. Applegate prepared and she executed her will.

By the terms of the agreement, which was duly recorded the day after its execution, among deeds in the county clerk's office, the parties, in consideration of $1 paid to each other, agreed, that complainant should take possession of and work the property in question, that he was to receive the income and profits therefrom and pay the mortgage, together with the interest thereon, as well as all taxes and other liens and assessments, then due and as they thereafter accrued; that Mrs. Rippe reserved to herself the use of the dwelling-house upon the property, and acknowledged that she had that day, in consideration of the agreement, executed her will, devising the property to complainant, and she agreed that this will should remain irrevocable. She further agreed not to convey or undertake to convey to anyone but complainant.

The agreement further provides that if complainant died unmarried, during the lifetime of Mrs. Rippe, the agreement should be null and void, and all rights of complainant thereunder should revert to Mrs. Rippe. If complainant died

during her lifetime, leaving a widow or children, then Mrs. Rippe agreed to pay to his widow and children such sum as he may have paid on account of the principal of the mortgage, and a reasonable sum, to be determined, representing the then value of such building improvements as he may have placed upon the premises.

By her will, Mrs. Rippe devised the property to complainant, subject to a charge thereon of $1,000, to be paid by him to her two daughters, and the residue of her estate she gave to her daughters. Complainant was appointed executor of the will, with power of sale.

Complainant entered into possession of the property, except the dwelling-house, and he continued to board with Mrs. Rippe, paying her $5 weekly.

Complainant, in carrying out the terms of the agreement, paid $475 on account of the principal of the $3,000 mortgage; he has also paid the interest thereon regularly since the execution of the agreement to March 20th, 1924, and he also paid the taxes as they became due to June 1st, 1924.

He put a new roof on the dwelling-house at a cost of $200, repaired the chimneys, put in new ceilings, papered the rooms and made other repairs to the dwelling-house, and he also built a greenhouse and hot beds on the property, costing about $1,000. His total outlay for these repairs, improvements and carrying charges is about $2,500, and the property is still subject to a lien of the mortgage for the balance of $2,500.

On September 7th, 1923, Mrs. Rippe, without informing complainant, executed another will, in which she bequeathed and devised her entire estate to her two daughters, and made her daughter Addie her executrix, and expressly revoked all former wills she had made.

On November 27th, 1923, Mrs. Rippe, who was then about seventy years old, died without having disclosed to complainant that she had made this will, or that she desired to be relieved from the performance of the agreement she had made with him.

This last will was duly admitted to probate without notice to complainant, and Addie has qualified and is acting as executrix thereunder.

In support of their contention that the agreement and the first will were the product of complainant's fraud and undue influence, defendants have shown that complainant on occasions swore at Mrs. Rippe, using the word "damn;" that at times he spoke to her in a loud and angry tone and that this conduct annoyed her and made her nervous.

Complainant admits that he may have used the word "damn" at times, but states he never swore at Mrs. Rippe, and never frightened her, or intentionally made her nervous.

Complainant denies persuading or influencing Mrs. Rippe to make the agreement, and he states he made the agreement primarily to preserve the home for her, and in this he is corroborated by the testimony of disinterested witnesses, who state Mrs. Rippe told them she had sold the property to complainant for the mortgage; that she had to sell it to someone, and she would rather have complainant have it than anyone else, because he had been so good to her, and that she felt she could not keep the property, as the girls had taken $1,500 of her money and left her penniless.

Complainant is further corroborated by the testimony of Mr. Applegate, who was not only the attorney, but a friend of Mrs. Rippe's for years, and who advised her about the nature and effect of the transaction she was making with complainant.

The agreement itself is the best evidence of the absence of fraud or undue influence on the part of complainant. By its terms the advantages are all given to Mrs. Rippe, she retains title to the property, she retains the use of the dwelling-house, she is relieved from all expenses of upkeep and from all carrying charges, and had complainant predeceased her, unmarried, she would have had the benefit of his labor and efforts in improving the property and also of all of the expenditures and disbursements he had made in improving and carrying it, and if he survived her, he could not have the property until he had paid $500 to each of her daughters.

Complainant acted in good faith and performed every agreement he made with Mrs. Rippe, but she did not treat him in the same way, for unknown to him, and influenced by Addie, she secretly made a new will, in violation of her agreement, and with knowledge on her part and on the part of her daughters, that complainant, acting under the agreement and the old will, had expended large sums of money upon the property, and with this knowledge she further violated her agreement by devising the property to her daughters, entirely ignoring all rights of complainant therein.

Addie is responsible for the execution of this later will; she knew of the agreement; she knew what complainant had done and had expended upon the property, and while her mother was ill, and three months before she died, she prevailed upon her to violate her solemn contract and to repudiate all claims complainant had upon her and upon the property.

This conduct upon her part is further evidenced by the nature of her counter-claim and by the proofs she has offered to establish it.

She admittedly did much work in the household and had the responsibility of its management, she collected money at times from the boarders and claims to have turned it over to her mother, or to have bought supplies with it; she claims that at her mother's request, in 1916, she abandoned the idea of marriage, because her mother told her if she would remain and take care of her she would be well taken care of and would be repaid for everything, and she admits that when the last will was made, her mother told her that she wanted her and her sister to have everything. Her claim is for $8,000, which is about $2,000 more than the property is worth.

My conclusion is that complainant has established his right to have the agreement specifically performed, and that the defendant has failed to establish the agreement for compensation alleged in her counter-claim.

A decree will be advised accordingly.